[Crim. No. 20123. June 29, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT JIMENEZ, Defendant and Appellant.

596

**COUNSEL**

Paul Halvonik, State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, and Kent L. Richland, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and Alexander W. Kirkpatrick, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MANUEL, J.—Defendant Robert Jimenez appeals following judgment of conviction entered after a jury found him guilty of one count of first degree murder (Pen. Code, § 187), three counts of armed robbery (Pen. Code, § 211) and one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)).

Among other contentions, defendant asserts that the trial court committed reversible error when it permitted the prosecution to introduce into evidence defendant's tape-recorded confession, on the grounds that (1) the record does not reflect that the trial judge was satisfied beyond a reasonable doubt that the confession was voluntary, which defendant argues is the standard of proof required under California law, and (2) that defendant's confession was involuntary because it was induced by promises of leniency. For the reasons set forth below, we agree that the prosecution must prove the voluntariness of a confession beyond a reasonable doubt. We also conclude that the defendant's confession was involuntary, having been induced by promises of leniency. It was therefore prejudicial error to admit his confession and defendant's conviction must be reversed.

On January 11, 1976, about 3 p.m., defendant and another man entered the El Norteno bar in El Monte. They sat down at the bar and ordered beer which they were served in a bottle by Mrs. Maria Insunza. After they drank their beer, both men left, but returned shortly thereafter. Defendant sat at the bar near the cash register and ordered another bottle of beer. His companion again left the building, but returned momentarily carrying a firearm. He fired one shot at the ceiling, telling everyone to stand still, and fired another shot at Mr. Soto, a customer. This shot went over Mr. Soto's head. Defendant then led Mrs. Insunza by the arm to the cash register and ordered her to open it and give him the money which it contained. Defendant removed approximately $70 from the opened cash drawer. Mrs. Insunza observed that defendant was not armed.

The wallets of several customers were also taken. One of these customers, Portunato Rodriquez, started to leave the bar through the back door. He was warned to stop, and was then shot by defendant's companion. He later died as a result of the gunshot wound. After

shooting Mr. Rodriquez, defendant's companion called defendant by his first name, Robert, and said they should leave. Both men then ran out of the bar. Police arrived shortly thereafter and Mrs. Insunza gave them the beer bottle from which defendant had been drinking. Defendant's fingerprints were found on the bottle.

On January 23, 1976, defendant and his companion were arrested at the latter's residence.[1] Alfred Sett, a deputy sheriff assigned to Los Angeles County's Homicide Bureau, was present when defendant was arrested and transported to the East Los Angeles sheriff's station. Shortly after defendant arrived at the station he was interrogated by Sergeant Sett along with Officer Mascorro of the El Monte Police Department. Both officers were present during the entire interrogation process which lasted several hours. Defendant first gave an oral statement in which he admitted that he had participated in the robberies, that his codefendant had used a .22 caliber automatic rifle during the course of the robberies, that his codefendant had shot the gun at one of the customers and had shot another customer, and that defendant had driven the getaway car and had later split the money taken in the robberies with the codefendant. Several hours later, defendant gave a second statement essentially the same as the first. This second statement was tape recorded. Defendant moved to suppress this tape-recorded statement on the grounds that it constituted an involuntary confession because it was induced by promises of leniency. After a hearing on the admissibility of the statement, the trial court, without mentioning what standard of proof it was applying, found that the defendant's statement was voluntary. The tape-recorded statement was subsequently played to the jury at defendant's trial.[2]

---

[1]Defendant and his companion had previously been arrested for a different crime and their "mug shots" had been taken on that occasion. These photos were shown to Mrs. Insunza shortly after the robbery and her positive identification of the defendant led to his arrest on January 23, 1976.

[2]Defendant's extrajudicial statement, admitting as it did all the facts necessary to constitute the offense of felony murder and robbery, constituted a confession of those offenses. With regard to the charge of assault with a deadly weapon on Mr. Soto, however, defendant's statement constituted only an admission. Nonetheless, inasmuch as the evidence on that charge was not strong, and the commission of this offense was integrally bound to the commission of the offenses to which the defendant had confessed, it cannot be said beyond a reasonable doubt that the defendant's confession of those offenses did not influence the jury's verdict on the assault with a deadly weapon charge. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The prejudicial effect of letting in the statement with regard to the deadly weapon offense was thus the same as it was with respect to the other offenses. For the purposes of this opinion, therefore, defendant's tape-recorded statement will be generally referred to as a confession.

I

 It is axiomatic that the use in a criminal prosecution of an involuntary confession constitutes a denial of due process of law under both the federal and state Constitutions. (*Payne* v. *Arkansas* (1958) 356 U.S. 560, 561 [2 L.Ed.2d 975, 977, 78 S.Ct. 844]; *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97]; *People* v. *Trout* (1960) 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Sanchez* (1969) 70 Cal.2d 562 [75 Cal.Rptr. 642, 451 P.2d 74].) In California, before a confession can be used against a defendant, the prosecution has the burden of proving that it was voluntary and was not the result of any form of compulsion or promise of reward. (*People* v. *Trout, supra,* 54 Cal.2d 576; *People* v. *Berve, supra,* 51 Cal.2d 286; *People* v. *Jones* (1944) 24 Cal.2d 601, 608 [150 P.2d 801]; *People* v. *Rogers* (1943) 22 Cal.2d 787, 804-805 [141 P.2d 722]; *People* v. *Siemsen* (1908) 153 Cal. 387, 394 [95 P. 863].)

Although this court has never decided the issue of the degree of proof by which the prosecution must prove the voluntariness of a confession, a number of decisions in the California Courts of Appeal have addressed the issue. Prior to 1972, these decisions uniformly concluded that the prosecution must establish proof of the voluntariness of a confession beyond a reasonable doubt. (*People* v. *Stroud* (1969) 273 Cal.App.2d 670, 678 [78 Cal.Rptr. 270]; *People* v. *Daniels* (1969) 1 Cal.App.3d 367, 374 [81 Cal.Rptr. 675]; *People* v. *Jackson* (1971) 19 Cal.App.3d 95, 100 [96 Cal.Rptr. 414]; *People* v. *Superior Court (Bowman)* (1971) 18 Cal.App.3d 316, 320-321 [95 Cal.Rptr. 757] (dictum).) This conclusion apparently was based on what was thought to be the rule under the federal Constitution as implied in *Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205], in which the United States Supreme Court held that an accused is entitled to a clearcut and reliable determination of the voluntariness of his confession before it can be introduced against him at trial.

In 1972, however, the Supreme Court held, in *Lego* v. *Twomey* (1972) 404 U.S. 477 [30 L.Ed.2d 618, 92 S.Ct. 619], that for purposes of the federal Constitution, the prosecution need only prove the voluntariness of a confession by a preponderance of the evidence. In *Lego,* application of the reasonable doubt standard had been urged on two separate grounds: (1) that this result was mandated by *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], which requires the prosecution to prove beyond a reasonable doubt every fact necessary to constitute the offense

charged, and (2) that those values that exclusionary rules are designed to serve can only be protected by application of the reasonable doubt standard.

Rejecting the contention that *Winship* required application of the reasonable doubt standard in determining the voluntariness of a confession, Justice White, writing for the majority in *Lego,* analyzed *Jackson* v. *Denno, supra,* 378 U.S. 368, and concluded that the hearing required by *Jackson* was not designed to enhance the reliability of jury verdicts so as to make application of the reasonable doubt standard necessary and that *Jackson* had neither implied nor suggested to the contrary.

The majority in *Lego* also rejected the contention that the reasonable doubt standard should be applied in order to safeguard the high value that our society places on the right of the individual to be free from coerced self-incrimination. Observing that federal constitutional rights appeared to be adequately protected by existing exclusionary rules which preclude use of coerced confessions against the accused at trial, the majority concluded that it was unnecessary to require application of the reasonable doubt standard in determining the preliminary question of the admissibility of confessions. At the same time, however, the majority made clear that the states, pursuant to their own law, would be free to adopt a higher standard of proof and could differ as to the resolution of the values they find at stake.

Decisions of the California Courts of Appeal after *Lego* stated that *Lego* called into question the continued validity of the pre-*Lego* California decisions which had required proof beyond a reasonable doubt of the voluntariness of a confession. These post-*Lego* decisions, concluded that California law did not require application of a standard of proof stricter than that required under the federal rule as articulated by *Lego.* (See *People* v. *Barrow* (1976) 60 Cal.App.3d 984, 990 [131 Cal.Rptr. 913]; *People* v. *Moreno* (1976) 61 Cal.App.3d 688 [132 Cal.Rptr. 569]; see also *People* v. *Hutchings* (1973) 31 Cal.App.3d 16 [106 Cal.Rptr. 905] (dictum) and *People* v. *Chen* (1974) 37 Cal.App.3d 1046 [112 Cal.Rptr. 894] (dictum).)

In *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 965, fn. 10 [127 Cal.Rptr. 135, 544 P.2d 1335], this court, noting the disparity in result between *Lego* and the pre-*Lego* California decisions, expressly left open the question which we now decide—whether California law requires a standard of proof stricter than that required by the federal Constitution.

■ In this state, whether a confession is voluntary and therefore admissible into evidence is a determination to be made outside the presence of the jury by the trial court, as provided in section 405 of the Evidence Code.[3] ■ As that section does not mandate a particular standard of proof, the matter is controlled by the general provisions of Evidence Code section 115 which declares in relevant part: *"Except as otherwise provided by law,* the burden of proof requires proof by a preponderance of the evidence." (Italics added.) The exception "as otherwise provided by law" includes "law established by judicial decisions as well as by constitutional and statutory provisions." (Evid. Code, § 160; *People* v. *Burnick* (1975) 14 Cal.3d 306, 313-314 [121 Cal.Rptr. 488, 535 P.2d 352].)

The standard of proof that is required in a given instance has been said to reflect ". . . the degree of confidence our society thinks [the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication." (*In re Winship, supra,* 397 U.S. 358, 370 [25 L.Ed.2d 368, 379] (Harlan, J., conc.).) The standard of proof may therefore vary, depending upon the gravity of the consequences that would result from an erroneous determination of the issue involved. Where such consequences are serious, the reasonable doubt standard may be required in order to protect against the possibility of an erroneous determination. (See *People* v. *Burnick, supra,* 14 Cal.3d 306, 310.) In order to properly evaluate the consequences that may result from an erroneous determination, it is necessary to consider the nature and purpose of the proceedings involved. (See *People* v. *Burnick, supra.*)

In the context of the present case, where the question to be decided is the appropriate standard of proof for determining the voluntariness of a confession, the admissibility of which has been challenged on constitutional grounds, we must consider the nature and purpose of the voluntariness hearing and the policies underlying the constitutional right

[3]Section 405 of the Evidence Code provides: "With respect to preliminary fact determinations not governed by Sections 403 or 404: (a) When the existence of a preliminary fact is disputed, the court shall indicate which party has the burden of producing evidence and the burden of proof on the issue as implied by the rule of law under which the question arises. The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises.

"(b) If a preliminary fact is also a fact in issue in the action: (1) The jury shall not be informed of the court's determination as to the existence or nonexistence of the preliminary fact. (2) If the proffered evidence is admitted, the jury shall not be instructed to disregard the evidence, if its determination of the fact differs from the court's determination of the preliminary fact."

involved, here, the privilege against self-incrimination, in order to determine what impact an erroneous determination of the voluntariness question would have.

Although the defendant urges that the privilege against self-incrimination contained in article I, section 15 of the state Constitution requires application of the reasonable doubt standard in order to fully protect the important values embodied therein, we find it unnecessary to reach the constitutional question as we conclude for the reasons set forth below that the reasonable doubt standard is required as a judicially declared rule of criminal procedure. (See *People* v. *Gainer* (1977) 19 Cal.3d 835, 852 [139 Cal.Rptr. 861, 566 P.2d 997] and cases cited therein.)

■ The privilege against self-incrimination, which is guaranteed by both the federal and California Constitutions, protects an accused against use by the prosecution of his confession unless it is shown to be the product of a rational intellect and a free will. (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274].) It has been said that the privilege against self-incrimination is the "essential mainstay" of our system of criminal justice (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 659, 84 S.Ct. 1489]), and reflects many of the fundamental values and most noble aspirations of our society, including: "our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminatory statements will be elicited by inhumane treatment and abuses; . . . our respect for the inviolability of the human personality . . .; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' *Quinn* v. *United States,* 349 U.S. 155, 162." (*Murphy* v. *Waterfront Comm'n* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594].)

The high value that our system of justice places on this right of the accused to be free from compulsory self-incrimination is reflected in the special safeguards that have been designed to preserve that right. Among such safeguards is the rule that automatically reverses a conviction when an involuntary confession has been used, even though there is ample evidence aside from the confession to support the conviction (*Ashcraft* v. *Tennessee* (1944) 322 U.S. 143 [88 L.Ed. 1192, 64 S.Ct. 921]; *Malinski* v. *New York* (1945) 324 U.S. 401 [89 L.Ed. 1029, 64 S.Ct. 781]; *People* v. *Siemsen, supra;* 153 Cal. 387; *People* v. *Trout, supra,* 54 Cal.2d 576;

*People* v. *Berve, supra,* 51 Cal.2d 286; *People* v. *Sanchez, supra,* 70 Cal.2d 562). Another is the rule that requires the exclusion at trial of all coerced confessions, even those confessions that may be independently established as true, because the methods used to extract them offend due process (*Rogers* v. *Richmond* (1961) 365 U.S. 534 [5 L.Ed.2d 760, 81 S.Ct. 735]). Under this rationale it has been held that even "[t]he *slightest* pressure, whether by way of inducement to confess or threat if confession is withheld, is sufficient to require the exclusion of the confession. . . ." (*People* v. *Siemsen, supra,* 153 Cal. at p. 394; *People* v. *Berve, supra,* 51 Cal.2d 286.) Additionally, in order to further guarantee that coerced confessions will not be used against the accused, before the jury is permitted to hear a confession, the trial court must first determine that the confession was in fact voluntarily rendered. (Evid. Code, § 405; *Jackson* v. *Denno, supra,* 378 U.S. 368.)

In making this determination, the trial court will often have to decide which one of two self-serving accounts to believe, as the testimony presented at a *Jackson* hearing ordinarily consists of conflicting versions by the defendant and law enforcement officers as to what occurred during the interrogation of the defendant by those officers which led to the defendant's confession. (See *Lego* v. *Twomey, supra,* 404 U.S. at p. 492 [30 L.Ed.2d at p. 629]; Brennan, J. dis.) In light of the factual nature of this inquiry, the degree of certainty as to which a trial court must be convinced that a confession is voluntary will often be of controlling significance. (*Id.* p. 492 [30 L.Ed.2d p. 629].) Thus, under the preponderance of the evidence test, a trial court will more often resolve factual conflicts in the evidence in favor of admitting a challenged confession, and this will correspondingly increase the risk that some involuntary confessions will thereby be admitted. The contrary result would obtain, however, if the reasonable doubt standard were applied, and this would thus decrease the risk that involuntary confessions would be admitted. (*Id.* at p. 493 [30 L.Ed.2d at pp. 629-630].)

█ Given the strong policies underlying the privilege against self-incrimination, which require exclusion of any coerced confession, and which mandate automatic reversal of a conviction whenever a coerced confession has been used against the accused at trial, it is apparent that the standard of proof for determining the admissibility of confessions in the first instance should be that standard which minimizes the risk, to the greatest extent possible, that a coerced confession will be admitted into evidence at trial. There is an additional reason for requiring the reasonable doubt standard. We have said that the more serious the

consequences resulting from an erroneous determination of the issue involved, the stricter will be the standard of proof that is required (*People v. Burnick, supra,* 14 Cal.3d 306). The consequences resulting from an erroneous determination of the voluntariness issue are especially severe, because the trial court's decision is almost always determinative of the issue. Thus, once the trial court has determined that a confession is voluntary and therefore admissible, the jury does not redetermine the voluntariness issue under section 405 of the Evidence Code (as amended) and an appellate court must accept the trial court's resolution of conflicting evidence, unless the evidence relied on by the trial court is so improbable as to be entirely unworthy of belief. (See *People v. Aikens* (1969) 70 Cal.2d 369, 378 [74 Cal.Rptr. 882, 450 P.2d 258]; *People v. Massie* (1967) 66 Cal.2d 899, 914 [59 Cal.Rptr. 733, 428 P.2d 869]; *People v. Stroud, supra,* 273 Cal.App.2d at p. 676.)

We are also persuaded that application of the reasonable doubt standard in determining the admissibility of a confession may, in some instances, have a salutary effect on the ultimate fact-finding process by reducing the possibility that coerced confessions *in general* will be admitted and thereby the possibility that coerced *false* confessions will be admitted. Although the admissibility of a confession depends not on whether a confession is true or false, but upon whether it is voluntary (see *Lego v. Twomey, supra,* 404 U.S. 477), this is not to say that the issue of coercion is unrelated to the question of reliability (see *Jackson v. Denno, supra,* 378 U.S. 368). Thus, although coercive methods do not necessarily produce a false confession, we have long recognized that they certainly may have that effect. (See *People v. Ditson* (1962) 57 Cal.2d 415, 439 [20 Cal.Rptr. 165, 369 P.2d 714] and cases cited therein.) For this reason, although the jury in California is not permitted to redetermine the issue of voluntariness, it may consider any evidence of coercion that may be presented by the defendant in order to determine the weight that the confession should be given. (See *People v. Carroll* (1970) 4 Cal.App.3d 52, 60 [84 Cal.Rptr. 60].)

Although a defendant must be allowed to present such evidence of coercion to show why his confession should not be believed, he is not, however, necessarily assured that in so doing he will prevail. For it cannot be denied that a confession, which admits every element of the prosecution's case, is ordinarily given overwhelming weight by the jury, and therefore, the defendant may not always be able to convince the jury to disregard this most devastating evidence of his guilt which emanated

from his own mouth (*People* v. *Stroud, supra,* 273 Cal.App.2d 670, 678), even when this evidence should, in fact, be viewed with distrust.

For this reason, a strict standard of proof which will operate to prevent consideration by the jury of coerced confessions in general and of coerced false confessions in particular may indirectly have a beneficial effect on the integrity of the ultimate fact-finding process, and at the same time will not unduly hamper the prosecution of criminal cases. Recognizing that voluntary confessions serve a legitimate law enforcement purpose, both in the investigation and prosecution of criminal cases (see *People* v. *Ditson, supra,* 57 Cal.2d 415, 434-435), we nevertheless believe that the People are in a position to impose adequate prosecutorial controls over the interrogation process so as to thereby remove almost all doubt as to whether a confession is voluntary. (See generally, Saltzburg, *Standards of Proof and Preliminary Questions of Fact* (1975) 27 Stan.L.Rev. 271, 294.)

For the above reasons, we are convinced that a rule requiring the prosecution to prove the voluntariness of a confession beyond a reasonable doubt reflects sound judicial policy; we therefore disapprove *People* v. *Barrow, supra,* 60 Cal.App.3d 984, 990; *People* v. *Moreno, supra,* 61 Cal.App.3d 688; *People* v. *Chen, supra,* 37 Cal.App.3d 1046 (dictum) and *People* v. *Hutchings, supra,* 31 Cal.App.3d 16 (dictum) to the extent those decisions are inconsistent with this holding. The rule which we have enunciated today requiring the prosecution to prove the voluntariness of a confession beyond a reasonable doubt, although it may have a different basis than did the pre-*Lego* California decisions (*People* v. *Stroud, supra,* 273 Cal.App.2d 670, 678 [78 Cal.Rptr. 270]; *People* v. *Jackson, supra,* 19 Cal.App.3d 95, 100; *People* v. *Superior Court (Bowman)* (1971) (dictum) 18 Cal.App.3d 316, 320-321 [95 Cal.Rptr. 757]), nevertheless reaches the same result; thus, any uncertainty that may have existed in the years after *Lego* as to the appropriate standard of proof in California for determining the voluntariness of a confession will now be eliminated and continuity will be restored to the law on this issue.

■ We have further determined that judicial reliance on post-*Lego* decisions can hardly have been significant, given the uncertainty in the six years following *Lego* as to whether California law required a standard of proof more stringent than the federal rule articulated therein. Therefore, in view of the important purposes served by the rule of criminal procedure which we announce today, we see no reason to deny the benefit of this rule to defendants whose cases are now pending on appeal.

(See *People* v. *Gainer, supra,* 19 Cal.3d 835, 853; *People* v. *Charles* (1967) 66 Cal.2d 330, 333-337 [57 Cal.Rptr. 745, 425 P.2d 545] and the cases cited therein.) ■ Furthermore, given the uncertainty as to the appropriate standard of proof in California in the years following *Lego,* we do not think it can be presumed that the trial court applied the correct standard in those cases in which the record is silent in this regard. (See *People* v. *Jetter* (1975) 15 Cal.3d 407, 408-409 [124 Cal.Rptr. 633, 540 P.2d 1217].) However, since any error as to the standard of proof applied in determining the voluntariness of a confession relates only to a question of preliminary fact, we have concluded that the effect of any such error should be measured in accordance with the standard enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243]; thus when it appears after looking at the whole record of the voluntariness hearing that there is no reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error, the trial court's finding of voluntariness should be sustained on appeal. In the context of the present case, however, it is not necessary to apply this rule, for, as we explain below, it must be concluded on the record before us that both of the defendant's confessions were involuntary as a matter of law, and that their admission into evidence constitutes reversible error.

## II

■ " 'As a reviewing court it is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found. . . . In exercising this function the court recognizes that the burden is on the prosecution to show that a confession was voluntarily given without previous inducement, intimidation or threat. . . . [Citations.]' Thus, in making an independent examination of the record to ascertain whether defendant's statements were voluntary we follow a practice of the United States Supreme Court which is both well established . . . and currently adhered to. [Citations.]" (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74]; see *People* v. *Haydel* (1974) 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866]; *People* v. *Randall* (1970) 1 Cal.3d 948, 954 [83 Cal.Rptr. 658, 464 P.2d 114].) With respect to conflicting testimony, of course, ". . . we accept that version of events which is most favorable to the People, to the extent that it is supported by the record." (*Ibid.;* accord *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 187 [133 Cal.Rptr. 511, 555 P.2d 297]; *People* v. *Carr* (1972) 8 Cal.3d 287, 296 [104 Cal.Rptr. 705, 502 P.2d 513].)

In the present case the record indicates that much of the testimony at the admissibility hearing was in conflict and that testimony will not be considered here. However, the testimony that follows is pertinent to our inquiry.

Sergeant Sett, the People's first witness, testified on cross-examination that after the defendant had indicated a willingness to talk about the case, Sett as part of a psychological ploy, told Officer Mascorro, within the presence and hearing of the defendant, that he did not want to talk to the defendant because the defendant would only give a self-serving statement by putting the blame on the codefendant, and that they already had enough on the defendant without his statement. Officer Mascorro indicated in response that he would like to talk to the defendant if the defendant was interested. Sergeant Sett then had mentioned that this was a serious case, in which the death penalty would be involved and that the defendant, who was 25 years old at the time of the crime, would be subject to the death penalty but Sett did not think that the codefendant would because he was only 18. Sergeant Sett knew at the time that it was the codefendant and not the defendant who had shot and killed Portunato Rodriquez. Sergeant Sett indicated that the defendant gave his first confession after this conversation with Mascorro and the tape-recorded statement was made several hours later.

Sergeant Sett was then asked a number of questions by defense counsel relating to whether the defendant had been told, during the interrogation, that things would go better for him in terms of the death penalty if he talked about the case. To questions specifically phrased in terms of benefits to the defendant if he told who had the gun and fired the fatal shot, Sergeant Sett replied that he and Mascorro already knew that information. To the more general question whether there was any conversation of benefits to the defendant if he talked about the case, Sergeant Sett's only response was that he did not recall.[4]

---

[4]The actual interchange between defense counsel and Sergeant Sett was as follows:
"Q. And did you further convey or indicate to Officer Mascorro that things may well go better for Mr. Jimenez if he talked with you and attempted to clarify the situation?
"A. He had already agreed to talk. Perhaps Mascorro mentioned something about that.
"Q. Do you recall either one of you saying things would get better for him in terms of the death penalty if the facts could be clarified as to who had the gun—who fired the fatal shot?
"A. In my mind—Mascorro's mind, we know who had the gun, and we knew who fired the shot.
"Q. Did you indicate to Mr. Jimenez that if he clarified that with you, if he told you that, that the jury would be told that, and things might go easier for him?

The defendant, in his testimony, confirmed the fact that before the defendant had made any statement, Sett had mentioned the death penalty and had indicated that the defendant would be subject to it, but the codefendant would not because of his youth. The defendant testified that he was scared by this talk about the death penalty and that he made his statements to the officers because Sett had told him that if he talked about the case, Sett would tell the jury and the jury would go lighter on him.

Although Officer Mascorro was called as a rebuttal witness by the People, he was not asked any questions about whether either he or Sett had told the defendant that things would go better for him with the jury if the defendant told the officers about the case, nor was Sergeant Sett recalled as a witness to specifically rebut the defendant's testimony to this effect. With regard to the death penalty, Officer Mascorro was asked only whether he had threatened that the defendant would get the death penalty and he replied in the negative.

 It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. (*People* v. *Johnson* (1969) 70 Cal.2d 469, 479 [74 Cal.Rptr. 889, 450 P.2d 265]; *People* v. *Brommel* (1961) 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 805]; *People* v. *Carr, supra,* 8 Cal.3d 287, 296; see also *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].) However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. (*People* v. *Nelson* (1964) 224 Cal.App.2d 238, 250 [36 Cal.Rptr. 385] and citations appearing therein.) The distinction that is to be drawn between permissible police conduct on the one hand and conduct deemed to have induced an involuntary statement on the other "does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth as represented by the police." (*People* v. *Hill, supra,* 66 Cal.2d at p. 549.) Thus, "[w]hen the benefit pointed out by the police to a

---

"A. I don't recall saying that.
"Q. Do you recall any conversation about what, if any, way it would help him if he talked with you?
"A. I don't recall, Counselor.
"Q. Do you recall Officer Mascorro at any time, or any officer, in your presence, indicating to Mr. Jimenez that he would be better off if, in fact, he cooperated and talked, so that it was understood that he was not the trigger man?
"A. I don't recall that. As I mentioned before, we knew who shot the gun."

suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. (*Ibid.*) On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . ." (*Ibid*; see also *People* v. *Nelson, supra,* 224 Cal.App.2d 238, 250-251.)

 With these considerations in mind and after examining the uncontradicted facts of the present record, we conclude that defendant's first confession was involuntary as it resulted from a promise of leniency. The fact that such a promise had expressly been made was not contradicted by the testimony of either Officer Mascorro or Sergeant Sett. Contrary to the People's contention, we are unpersuaded that Sergeant Sett's failure to recall such a promise constituted an implied denial that the promise had in fact been made. The meaning of his response to defense counsel's questions was, at best, equivocal, and did not constitute a sufficient answer to the question posed. We have said in another context that a witness' testimony that he does not recall making a statement represents only a present failure to recollect, and therefore does not constitute a contradiction of a prior statement. (See *People* v. *Sam* (1969) 71 Cal.2d 194, 208-210 [77 Cal.Rptr. 804, 454 P.2d 700].) We see no reason to depart from this rule here. The prosecution, which had the burden of proof on the issue, could either have asked Sergeant Sett on redirect examination whether, to the best of his recollection, a promise of leniency had or had not been made, or the prosecution could have asked Officer Mascorro, who had been present during the entire interrogation, what was said to the defendant in this regard. This the prosecution failed to do; thus, although some of the defendant's testimony was disputed, his testimony that he was told that he might get leniency from the jury if he gave a statement about the case to the police officers, remained uncontradicted.

The People urge that even if the defendant's claim that promises had been made was not specifically contradicted by the police officers, the trial court's resolution of the voluntariness issue in favor of the People should nonetheless be sustained. They point to the overall conflict in the evidence and the inherent improbability of other aspects of the defendant's testimony in suggesting that, as a matter of assessing the credibility of witnesses, the trial court had good cause to disbelieve and obviously did disbelieve the defendant's testimony that promises of leniency had in

fact been made. For this reason, the People urge that when the trial court's finding of voluntariness is based on credibility assessments, that finding should not be disturbed on appeal unless it is palpably erroneous. The People rely on *People* v. *Carr, supra,* 8 Cal.3d 287, and the cases cited therein in support of this contention. In *Carr,* the testimony relating to whether promises had been made was in conflict, and therefore, we accepted the findings of the trial court which we said had obviously disbelieved the testimony of the defendant. In this case, however, the evidence relating to promises is not in conflict; therefore, if we were to adopt the rule suggested by the People, we would in effect be abrogating our duty to independently determine from the uncontradicted facts whether the confession was voluntary. We think that this would be unwise, given the importance of the constitutional rule involved. ██ Moreover, as it has been stated in another context, "[d]isbelief [of a witness' testimony] does not create affirmative evidence to the contrary of that which is discarded." (*Estate of Bould* (1955) 135 Cal.App.2d 260, 264 [287 P.2d 8, 289 P.2d 15]; see also *People* v. *Blakeslee* (1969) 2 Cal.App.3d 831 [82 Cal.Rptr. 839].) Applying this rule to the present case, where the People had the burden of proof on the issue of the voluntariness of defendant's confession, it is apparent that disbelief by the trial court of defendant's testimony would not suffice as a substitute for an affirmative showing by the People sufficient to discharge their burden.

██ In any event, even if we were to assume that no *express* promises to the defendant had in fact been made, our conclusion that the defendant's first confession was involuntary would remain unchanged because we believe that the confession was the result of an *implied* promise of leniency. The defendant testified and this testimony was corroborated by Sergeant Sett that the defendant was told he could get the death penalty, but that his codefendant probably would not. Sergeant Sett knew when he made this statement, as did the defendant, that it was the codefendant who had committed the murder and that the defendant had not been armed. By telling the defendant that his codefendant probably would not get death, but that he might, Sergeant Sett's remarks carried with them the clear implication that by cooperating and telling what had actually happened, the defendant could possibly avoid getting a worse punishment than his codefendant because either the jury or court might treat him with leniency and not sentence him to death. As the uncontradicted evidence thus clearly indicates that defendant's confession was motivated by the benefits implied in Sett's remarks, his confession must be deemed involuntary. (See *People* v. *Johnson, supra,* 70 Cal.2d 469, 478-479.)

We further conclude that defendant's subsequent tape-recorded confession was also involuntary. ▮▮▮ The rule has been long and well settled in this state, that when an accused who has been subjected to improper influences makes a confession, and shortly thereafter again incriminates himself, ". . . there is a presumption that the influence of the prior improper treatment continues to operate on the mind of the defendant and that the subsequent confession is the result of the same influence which rendered the prior confession inadmissible, and the burden is upon the prosecution to clearly establish the contrary. [Citations.]" (*People* v. *Jones, supra,* 24 Cal.2d 601, 609; see also *People* v. *Sanchez, supra,* 70 Cal.2d 562, 574.) ▮▮▮ In the present case, no evidence at all was presented showing that the tape-recorded confession was free from the taint of the prior confession. Therefore, it was error to have admitted the tape-recorded confession, and the judgment of conviction must be reversed.

For the guidance of the court on retrial, we would indicate that in considering any motion to exclude the in-court identification of the defendant on the ground that it was tainted by an allegedly unduly suggestive pretrial photographic identification, the trial court should take into account, in addition to the other strong points of dissimilarity between defendant's photograph and those of the other individuals displayed, the fact that the defendant's first name appeared on his photograph and that name was used by the codefendant in reference to the defendant during the course of the robbery.

The judgment is reversed.

Bird, C. J., Tobriner, J., Mosk, J., and Newman, J., concurred.

**CLARK, J.,** Concurring.—In Part I, the majority discuss the question whether the standard of proof for determining voluntariness of a confession should be by preponderating evidence or by proof beyond a reasonable doubt, ultimately endorsing the more difficult test as a judicially declared rule of criminal procedure. In Part II, however, the majority conclude defendant's confessions were involuntary *as a matter of law,* rendering Part I dictum.

Until we face a case requiring resolution of this issue I shall simply note my tentative approval of the analysis leading the high court in *Lego* v. *Twomey* to retain the preponderating evidence test. "[W]e are

unconvinced that merely emphasizing the importance of the values served by exclusionary rules is itself sufficient demonstration that the Constitution . . . requires admissibility to be proven beyond reasonable doubt. Evidence obtained in violation of the Fourth Amendment has been excluded from federal criminal trials for many years. [Citation.] The same is true of coerced confessions offered in either federal or state trials. [Citations.] But, from our experience over this period of time no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence. Petitioner offers nothing to suggest that admissibility rulings have been unreliable or otherwise wanting in quality because not based on some higher standard. Without good cause, we are unwilling to expand currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries and by revising the standards applicable in collateral proceedings. Sound reason for moving further in this direction has not been offered here nor do we discern any at the present time. This is particularly true since the exclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in Fourth and Fifth Amendment suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence." (*Lego v. Twomey* (1972) 404 U.S. 477, 488-489 [30 L.Ed.2d 618, 627, 92 S.Ct. 619].) In a footnote the high court added: "It is no more persuasive to impose the stricter standard of proof as an exercise of supervisory power than as a constitutional rule." (404 U.S. at p. 488, fn. 16 [30 L.Ed.2d at p. 627].)

Richardson, J., concurred.

Respondent's petition for a rehearing was denied August 24, 1978. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.